## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DENISE CANTRELL DUNSMORE,
as Personal Representative of the Estate
of Brett Colin Cantrell,

      Plaintiff,

v.                                                                Case No: 8:23-cv-1456-CEH-CPT

RICK WELLS, KELLY ZEITZ, RN,
NAPHCARE, INC., AMBER KENT-
STEVENS, CMA, EILEEN LOPEZ,
LPN, ELVIRA PEREZ, M.D.,
MANATEE COUNTY, FLORIDA and
ROY THOMPSON, LPN,

      Defendants.

_____/

## O R D E R

      This matter comes before the Court on NaphCare Defendants' Motion to Dismiss (Doc. 50), Sheriff Rick Wells' Motion to Dismiss (Doc. 51), Manatee County's Motion to Dismiss (Doc. 66), and Defendant Roy Thompson's Motion to Dismiss (Doc. 74). Plaintiff responded in opposition to the respective motions. Docs. 60, 61, 75, and 77. In the motions, Defendants seek dismissal of Plaintiff's Amended Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Additionally, Sheriff Wells and Manatee County move to dismiss or strike Plaintiff's request for punitive damages, which Plaintiff does not oppose. The Court, having considered the motions and being fully advised in the premises, will grant the motions to dismiss

and/or strike the Plaintiff's punitive damage claims against Sheriff Wells and Manatee County. In all other respects, the motions to dismiss are denied.

## I.   BACKGROUND[1]

In this action filed under 42 U.S.C. §§ 1983 and 1988, Plaintiff Denise Cantrell Dunsmore ("Plaintiff"), who is the mother of Brett Colin Cantrell ("Cantrell") and personal representative of Cantrell's estate, sues Defendants for the tragic death of her son while Cantrell was a pretrial detainee at the Manatee County Jail. Doc. 43. In her Amended Complaint, Plaintiff names the following Defendants: (1) Rick Wells ("Sheriff Wells"), Sheriff of Manatee County Sheriff's Office ("MCSO"); (2) NaphCare, Inc. (NaphCare"), *Id.* ¶ 44. who contracted with Manatee County to provide medical services to those detained at the Manatee County Jail; (3) Manatee County ("County") who hired NaphCare; (4) Kelly Zeitz, R.N. ("Nurse Zeitz"), (5) Medical Assistant Amber Kent-Stevens, CMA ("Medical Assistant Kent-Stevens"); (6) Eileen Lopez, LPN ("Nurse Lopez"); (7) Roy Thompson, LPN ("Nurse Thompson"); and (8) Elvira Perez, M.D. ("Dr. Perez"), who was the medical director at the Manatee County Jail. *Id.* ¶¶ 8–13.

The Manatee County Jail ("Jail") is a correctional facility intended to detain people who are accused of violating Florida's criminal laws within Manatee County, Florida. *Id.* ¶ 14. On or abut March 22, 2020, Cantrell was arrested by MCSO and

---

[1] The following statement of facts is derived from the Amended Complaint (Doc. 43), the allegations of which the Court must accept as true in ruling on the instant Motion to Dismiss. *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983).

detained as a pretrial detainee at the Jail on a charge of violation of probation. *Id.* ¶¶ 15, 67.  Cantrell remained in the custody of MCSO and the County until his death in the infirmary cell of the Jail on March 27, 2020. *Id.* ¶ 16.

The Jail was designed and built to hold approximately 884 inmates. *Id.* ¶ 19. Notwithstanding, as of June 2016, the daily average jail population was 1,123. *Id.* ¶ 20. From 2015 to 2018, the daily population in the Jail ranged from 942 to 1128. *Id.* ¶ 21. In an April 28, 2017, letter from Sheriff Wells to the County, he recognized that the operations division in the jail was understaffed. *Id.* ¶ 22. In November 2021, the Jail's capacity was 988 but had an average daily population of 1,178. *Id.* ¶ 26.

The Jail maintained an infirmary section. *Id.* ¶ 23. Although built to accommodate 24 inmates, the infirmary was often over capacity with an average of 36 to 38 people. *Id.* ¶ 24.  At all relevant times, the Jail had only one non-psychiatric M.D. physician that also served as medical director. *Id.* ¶ 25. The overcrowding of the Jail and the infirmary continued into 2020 when Cantrell was incarcerated. *Id.* ¶ 26. It was not until 2022 that Sheriff Wells and the County contracted to add a new medical ward because, at the time, their existing 24-bed infirmary routinely housed 50 to 60 inmates. *Id.* ¶ 26.

The County's Board ("Board") consisted of seven members. *Id.* ¶ 17. Some of the Board's meetings and work sessions discussed the Jail. *Id.* The Board was supposed to receive monthly reports on the average daily population of the Jail. *Id.* ¶ 18. Since at least 2015, the Board repeatedly expressed concerns that the County had no choice

but to renew its previous medical care contractor, Armor Correctional Health Services ("Armor"), or increase their budget. *Id.* ¶ 27. The Board expressed negative sentiments about increasing costs of providing health care in the Jail. *Id.* ¶ 28. In a November 2017 meeting, several Board members again voiced concerns about the rising costs of providing medical care at the Jail. *Id.* ¶ 32. In the March 5, 2018 Memo following the Board's February 20, 2018 work session, the Board expressed concern over infirmary overpopulation, ambulance costs, outside medical service trends, transportation costs for emergency room visits, and emergency treatment issues. *Id.* ¶ 34. In response, representatives of Armor pointed out that only 58 of the 512 recorded ambulance-to-hospital runs were initiated by Armor. *Id.*

Ultimately, Sheriff Wells and the County discontinued their relationship with Armor and the County contracted with NaphCare to provide medical services at the Jail. *Id.* ¶ 35. Citing news articles from other jurisdictions, Plaintiff alleges that NaphCare has a history of deliberate indifference and a custom, policy, practice, and procedure of failing to send inmates to the hospital, delaying urgent medical treatment, and poor record-keeping. *Id.* ¶ 35.

Plaintiff attaches a copy of the Contract between the County and NaphCare to her Amended Complaint. Doc. 43-1. The contract was executed November 27, 2018, with an effective date of January 1, 2019, and a three-year term continuing in effect until December 31, 2021. *Id.*; Doc. 43 ¶¶ 36, 41. The base price for the first year for all of NaphCare's services was approximately six million dollars. Doc. 43 ¶ 43. Under the Agreement, NaphCare was required to provide all medical and other health care

4

services, including laboratory, x-ray, and pharmacy services to Jail inmates and detainees. *Id.* ¶ 45. The Agreement provided that NaphCare would be responsible for the cost of all outside hospitalizations. *Id.* ¶¶ 44, 46. NaphCare had the duty to recruit, select, train, promote, transfer, and release its personnel. *Id.* ¶ 48. During the term of the contract, the County and MCSO periodically reviewed NaphCare's history of performance at other facilities around the country. *Id.* ¶ 53. When it took over from Armor as the Jail's medical provider, NaphCare retained much of the same staff employed by Armor, including Dr. Perez. *Id.* ¶¶ 56, 57. In 2020, the County and NaphCare were in a contractual dispute related to pharmacy costs exceeding the contractual amount. *Id.* ¶ 55.

Under Florida law, the County has a statutory duty to pay for medical expenses of pretrial detainees and prisoners at the Jail. *Id.* ¶ 58 (citing Fla. Stat. § 901.35(2)(a)). That responsibility exists until such time as a pretrial detainee is released from the arresting agency. *Id.* The County and MCSO had a non-delegable duty to provide medical care to pretrial detainees, such as Cantrell, while he was in the custody of the MCSO. *Id.* ¶ 60. The County and the MCSO contracted with NaphCare for NaphCare to provide health care and mental health services to people detained at the Jail. *Id.* ¶ 61.

Under MCSO's policies, inmates at the Jail requiring emergency outside medical treatment are to be transported to the Manatee Memorial Hospital emergency room unless treatment can be best rendered elsewhere. *Id.* ¶ 63. The employees of the

5

Corrections Bureau and the contracted healthcare provider must work together to provide inmate medical care in a timely and security conscious manner. *Id.* ¶ 64. Jail staff must respond to emergency medical situations within four minutes of notification. *Id.* ¶ 65. MCSO's policies require staff to conduct a visual check of all inmates once every two hours during the day and once every six hours between the hours of 11:00 p.m. and 6:00 a.m. *Id.* ¶ 66.

At the time of his incarceration on March 22, 2020, Cantrell was reported to have a cough and fever for several days. *Id.* ¶ 68. He was suspected of being COVID-19 positive, but he was not. *Id.* ¶¶ 68, 73. Cantrell was deemed at risk for drug and alcohol withdrawal. *Id.* ¶ 69. On March 23, 2020, Nurse Thompson completed a "Receiving Screening" for Cantrell, noting he was recently evaluated for abdominal pain and was informed that he may have an Abdominal Aortic Aneurysm ("AAA"). *Id.* ¶ 70. Although AAA can be life threatening, Nurse Thompson did not notify a medical provider or send Cantrell to the emergency room for medical evaluation. *Id.* Nurse Thompson also noted that Cantrell had fainted two days prior to arrest, but he did not notify a medical provider or send Cantrell to the ER. *Id.* ¶ 71. Due to Cantrell's medical history and recent illness, he was housed in the overpopulated infirmary in a cell with five other inmates. *Id.* ¶ 72.

A March 22, 2020 admission note states "IVFs started and will obtain Labs (sic) work to assess for underlying condition." *Id.* ¶ 74. On March 24, 2020, a Vital Signs document reflected Cantrell had a low-grade fever of 99.1 and hypotensive blood

pressure (low at 93/61), with a resting pulse of 105. *Id.* ¶ 75. Despite the abnormal vitals, the medical director was not called or notified, nor was Cantrell sent to an ER or hospital, and no blood/lab work was done. *Id.* There is no notation in the medical records of blood work being done on March 24, 2020. *Id.* ¶ 76,

On the morning of March 25, 2020, at 7:46 a.m., Cantrell reported not feeling well and Nurse Lopez documents his blood pressure reading of 87/57 on two separate reads, with a pulse of 102, and O2 saturation down to 96. *Id.* ¶ 79. No effort was made to send Cantrell to the hospital. *Id.* There are two separate entries on March 25, 2020, made by Medical Assistant Kent-Stevens of Cantrell's BP of 102/64 at 9:52 a.m. and 137/89 at 9:53 a.m. *Id.* ¶ 81. Plaintiff alleges that the disparity in the readings one minute apart draws into question the accuracy of the results. *Id.*

A SOAP[2] note by Medical Director Perez is dated March 25, 2020, at 10:52 a.m., but was actually entered by Dr. Perez on March 27, 2020, at 1:24a.m. *Id.* ¶ 77. The late entry SOAP Note documents: "Elevated HR: likely related to intravascular depletion = IVF's." *Id.* ¶ 78. The treatment plan included obtaining labs and notifying the M.D. once there is a report available from the lab tests. *Id.* Dr. Perez did not examine Cantrell at any time from March 22 through March 26. *Id.* ¶ 95.

On March 25, 2020, at 7:43 p.m., Nurse Zeitz documents that "Pt. refused last IV bag of fluids. Will continue to monitor and have provider f/u in a.m." *Id.* ¶ 82. Blood tests were not obtained until 8:58 a.m. on March 26, 2020, with delayed delivery

---

[2] SOAP notes allow clinicians to document patient encounters. "SOAP" refers to subjective, objective, assessment, and plan.

to the lab, and the lab results were not received back until the early morning hours of March 27, 2020, after Cantrell died. *Id.* ¶¶ 83, 91.

On March 26, 2020, video evidence revealed Cantrell was in extreme medical distress, including difficulty breathing, restlessness, irritability, vomiting, and explosive diarrhea. *Id.* ¶ 84. Just after midnight on March 27, 2020, video of Cantrell shows him using his bed sheets to clean feces off himself as he ran out of toilet paper, which occurred about an hour after Cantrell pleaded for help because he could not breathe. *Id.* A note at 12:47 a.m. states that Cantrell asked for assistance because he was having a hard time breathing and was advised by Nurses Zeitz and Thompson that he was "medically fine." *Id.* ¶ 85. No staff member did a physical or in-person check on Cantrell or a recheck of his vital signs by 1:00 a.m., although the preceding day's 11:59 p.m. note stated to recheck within one hour. *Id.* ¶ 86. Video evidence documented Cantrell restlessly moving about in his infirmary bed until his body became lifeless at approximately 1:15 a.m. *Id.* ¶ 87. Had Nurses Zeitz or Thompson taken Cantrell's vitals at 1:00 a.m., Plaintiff alleges that Cantrell may be alive today. *Id.* ¶ 88.

It was not until 2:34 a.m. that MCSO and NaphCare staff were alerted to Cantrell's bed by another inmate. *Id.* ¶ 89. MCSO and NaphCare nurses detected no pulse, CPR was administered, and Cantrell was pronounced dead at 2:55 a.m. on March 27, 2020. *Id.* After Cantrell's death, Nurse Seitz obtained verbal lab results for Cantrell. *Id.* ¶ 90. An autopsy that was done reflected Cantrell's cause of death was

8

necrotizing pneumonia. *Id.* ¶ 97.  Plaintiff alleges that Cantrell's death was caused by the deliberate indifference of Defendants in failing to provide reasonable and necessary medical care and treatment, failing to transfer him to a hospital for treatment, and for misrepresenting that he was "medically fine" when he was clearly in distress. *Id.* ¶¶ 96–101.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient.  *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not sufficient.  *Id.*  A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face."  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint.  *Id.*

## III.   DISCUSSION

Plaintiff pursues a theory of deliberate indifference under Section 1983 in all eight claims against Defendants. Section 1983 imposes liability on any person who,

under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks and quoted authority omitted). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.*

The Fourteenth Amendment requires government officials to provide basic necessities, including medical care, to pretrial detainees, such as Cantrell. *Ireland v. Prummell*, 53 F.4th 1274, 1287 (11th Cir. 2022) (citing *Hamm v. DeKalb Cnty*, 774 F.2d 1567, 1574 (11th Cir. 1985)); *see also Christmas v. Nabors*, 76 F.4th 1320, 1335 (11th Cir. 2023) ("pretrial detainees have a right to receive medical treatment for their illnesses and injuries") (citations and internal quotation marks omitted). Thus, a failure to provide the appropriate medical care to a pretrial detainee violates the Fourteenth Amendment and is actionable under § 1983. *Ireland*, 53 F.4th at 1287 (citing *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015)).

A.    **Municipal Liability under Section 1983**

A plaintiff bringing a section 1983 claim against a municipality based on the acts of one of its employees/agents must prove two things. First, the plaintiff must sufficiently allege a constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Second, the "plaintiff suing a municipality under § 1983 must show that the municipality itself injured the plaintiff by having in place a policy or custom

which violated the plaintiff's rights." *Buckner v. Toro*, 116 F.3d 450, 451 (11th Cir. 1997) (citing *Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658 (1978)).

Under *Monell*, the municipal "policy" or "custom" must be the moving force behind the constitutional violation and "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an actionable city 'policy.'" *City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989).

### 1.    Sheriff Wells/MCSO[3]

Officials cannot be held liable pursuant to Section 1983 solely on the basis of *respondeat superior* or vicarious liability. *Bryant v. Jones*, 575 F.3d 1281, 1299 (11th Cir. 2009) (citations omitted). Instead, supervisory defendants can only be liable if they participate in the violation or if their actions caused the violation. *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003). Plaintiff has not alleged that Sheriff Wells participated in the alleged violations. Rather, Plaintiff's allegations are based on a policy or custom of Sheriff Wells and MCSO in overlooking NaphCare's widespread

---

[3] "Sheriff's departments and police departments are not usually considered legal entities subject to suit, but capacity to sue or be sued shall be determined by the law of the state in which the district court is held." *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992); *see also* Fed. R. Civ. P. 17(b). "Under Florida law, sheriff's offices lack the legal capacity to be sued." *Wilk v. St. Lucie Cnty. Fla. Sheriff Off.*, 740 F. App'x 658, 662 (11th Cir. 2018); *accord Faulkner v. Monroe Cnty. Sheriff's Dep't*, 523 F. App'x 696, 701 (11th Cir. 2013) ("Florida law has not established [s]heriff's offices as separate legal entities with the capacity to be sued."); *see also Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1361 (S.D. Fla. 2016) ("[T]he Sheriff in his official capacity, and not the county 'Sheriff's Office,' is the proper party to an action against the Sheriff or any employee of the Sheriff's Office.") Accordingly, Plaintiff names Sheriff Wells as Defendant, in his official capacity, for the Manatee County Sheriff's Office.

policy of not emergently transporting inmates when warranted and a custom of employing individuals without current and valid CPR certification or proper training to respond to medical emergencies. Doc. 43 ¶¶ 146–148. When alleging a claim against a sheriff based on an official policy, a plaintiff must identify either (1) "an officially promulgated policy, or (2) an unofficial custom or practice shown through the repeated acts of the final policymaker of the entity." *Crenshaw v. Lister*, 509 F. Supp. 2d 1230, 1237 (M.D. Fla. 2007) (citing *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329-30 (11th Cir. 2003)). "Plaintiff must identify the policy or custom which caused his injury so that liability will not be based on an isolated incident, *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (citations omitted), and the policy or custom must be the moving force of the constitutional violation." *Crenshaw,* 509 F. Supp 2d at 1237 (citing *Grech*, 335 F.3d at 1330).

In the Amended Complaint, Plaintiff alleges that the MCSO had a non-delegable duty to provide health care and services to pretrial detainees at the Jail. Doc. 43 ¶ 132. Pursuant to an agreement, MCSO and Sheriff Wells regulated and funded NaphCare, whom they contracted to perform the governmental act of providing health care services to pretrial detainees, including Cantrell. *Id.* ¶ 133. Prior to and during Cantrell's detention, NaphCare had a history and longstanding practice of failing to transport pretrial detainees to outside medical services such as urgent cares, emergency rooms, and hospitals or to activate emergency ambulance services for the benefit of pretrial detainees. *Id.* ¶¶ 142–145. Plaintiff also alleges that Sheriff Wells and MCSO had constructive knowledge of NaphCare's longstanding and widespread practice of

not calling for emergency services when needed, and Sheriff Wells and the MCSO did nothing to take action to stop this practice. *Id.* ¶ 146. Plaintiff further alleges that Sheriff Wells and MCSO had several policies that support their claim of deliberate indifference: a custom or policy of overlooking NaphCare's failure to comply with its contractual obligations and to adequately train its employees working at the jail. *Id.* ¶¶ 147, 148; a policy of allowing employees to work at the Jail that did not have current and valid CPR certification or without proper training in responding to medical emergencies. *Id.* ¶ 149; a policy of allowing or condoning the provision of inadequate care to pretrial detainees and ratifying the deliberate indifference to the health care needs of pretrial detainees, including Cantrell. *Id.* ¶¶ 154, 155. The customs and policies were motivated by convenience and financial disincentives, known by Sheriff Wells and the MCSO, regarding the costs associated with proper auditing and evaluating NaphCare, having to terminate NaphCare's agreement and find a new third-party vendor, and facing the prospects of recruiting, training, and supervising new workers. *Id.* ¶¶ 158, 159. Plaintiff alleges that Sheriff Wells and MCSO's customs and policies placed pretrial detainees, like Cantrell, within the zone of risk to be damaged or harmed and that the Defendants' deliberate indifference caused Cantrell's death in an overcrowded infirmary cell. *Id.* ¶¶ 164–166. In a light favorable to Plaintiff, the Amended Complaint states a cause of action for deliberate indifference against Sheriff Wells, in his official capacity, for the MCSO.

In his motion to dismiss, Sheriff Wells asserts that any claim against him is redundant to Plaintiff's claim against the County and therefore should be dismissed.

Doc. 51. Because Plaintiff's *Monell* claims against Sheriff Wells and the County are based on the same general theory that the Sheriff and the County were financially disincentivized to provide adequate medical care to Jail detainees, Sheriff Wells argues that MCSO was not a party to the contract with NaphCare and therefore had no obligation to fund or pay for NaphCare's services. In support, Sheriff Wells directs the Court to the contract Plaintiff attaches to the Amended Complaint which reflects that the agreement with NaphCare was entered into between the County and NaphCare, and neither Sheriff Wells nor MCSO was a party to the agreement.  Sheriff Wells argues that, pursuant to Manatee County ordinance, the Sheriff has been designated as the County's chief correctional officer and thus he serves at the pleasure of and as an arm of the County. Doc. 51 at 8–9 (citing Manatee County Ordinance 88-14). As such, he contends that Plaintiff's claim against the Sheriff should be dismissed as duplicative of Plaintiff's claim against the County.

In a light favorable to the Plaintiff, Plaintiff has adequately alleged a Section 1983 claim against the Sheriff. The NaphCare contract was entered into for the provision of medical care to the inmates in the care, custody, and control of the MCSO who operates the Jail. Doc. 43-1 at 1, 14. Additionally, Plaintiff alleges a custom of Sheriff Wells and MCSO not having employees who are CPR-certified or trained in responding to emergency situations. While Plaintiff may not ultimately be able to bring claims to trial against both the County and Sheriff Wells to the extent the alleged violations are the same for both Defendants, Plaintiff has, at least at this juncture, stated a cause of action against Sheriff Wells.

14

Alternatively, Sheriff Wells argues that to the extent the medical Defendants were not deliberately indifferent, the policies of Sheriff Wells become moot and Plaintiff's Section 1983 claim against the Sheriff fails. In that regard, he argues that for Plaintiff to be successful on a *Monell* claim against Sheriff Wells, Plaintiff must first establish a deprivation of rights. The Court agrees. However, Sheriff Wells' argument rests primarily on adopting the arguments of the NaphCare Defendants in their motion to dismiss. This Court's local rules preclude a party from incorporating by reference in their memorandum all or part of any other motion, legal memorandum, or brief. *See* M.D. Fla. L.R. 3.01(f) (Apr. 1, 2024). In any event, because the Court concludes below that Plaintiff states a cause of action against the NaphCare Defendants based on a deliberate indifference theory, the Sheriff's argument that a constitutional violation has not been alleged is without merit. Thus, Sheriff Wells' motion to dismiss is due to be denied, except as to the issue of punitive damages, which is addressed below.

### 2.    Manatee County

Section 1983 allows a prisoner to sue the municipality, or county, that runs the prison system. *Fields v. Corizon Health, Inc.*, 490 F. App'x 174, 181 (11th Cir. 2012). "To do so, the prisoner must show that the municipality had a 'custom or policy that constituted deliberate indifference to that constitutional right' [and] . . . that the custom or policy caused the constitutional violation, as *respondeat superior* liability is not permitted." *Id.* (quoting *McDowell*, 392 F.3d at 1289). In its motion to dismiss, the County argues that Plaintiff's Amended Complaint "muddles" its Section 1983 deliberate indifference claim against the County by including allegations of negligent

hiring, supervision, retention and/or training. Doc. 66. Thus, the County submits it is unclear whether Plaintiff is attempting to assert any other claim against it besides the *Monell* claim under Section 1983. Regarding Plaintiff's Section 1983 deliberate indifference claim, the County argues that no unconstitutional policy or custom has been alleged to give rise to *Monell* liability. The County further contends that the Amended Complaint fails to allege any facts establishing a long-standing or widespread County custom of allowing County employees to engage in deliberately indifferent conduct toward detainees' medical needs. The County argues that Plaintiff may not rely on the facts of the *Hannah* lawsuit because that case involved a predecessor health care company, Armor. The County similarly submits that Plaintiff's allegations regarding a failure to train fall far short of evidencing a deliberate indifference. Lastly, the County argues Plaintiff's claim for punitive damages should be stricken.

In response, Plaintiff argues that switching health care companies does not absolve the County of liability, particularly where the new company, NaphCare, used many of the same employees. Plaintiff additionally argues that the County's motion ignores Plaintiff's allegations of the County's policy to allow overcrowding of the Jail, particularly the infirmary/medical unit, which overcrowding was the moving force behind the constitutional violation. Plaintiff submits she has sufficiently alleged a custom and practice of failing to seek doctor consultations, failing to send inmates to the hospital, refusing and delaying urgent medical treatment and poor medical records

keeping and documentation, and that such failures were driven by an effort to cut costs.

Review of the Amended Complaint reveals Plaintiff has adequately alleged the existence of a policy or custom to give rise to a *Monell* claim against the County, and as discussed below, the Amended Complaint alleges a constitutional violation against the NaphCare Defendants.[4] In Count III of the Amended Complaint, Plaintiff alleges the County had a long-standing policy and custom to place cost of care over quality of care for inmates of the Jail. Doc. 43 ¶ 175. The County had knowledge of NaphCare's longstanding and widespread practice of failing to provide specialty or emergent care for prisoners or arrange transport to urgent cares, emergency rooms, or hospitals. *Id.* ¶¶ 187, 188. Plaintiff further alleges the County had a policy or custom of not evaluating prospective contractors such as NaphCare to ensure they were performing under the agreement for care and that they were properly assessing pretrial detainees' health conditions and activating emergency services when warranted. *Id.* ¶¶ 190–193. Plaintiff also alleges the County had a policy or custom of condoning or ratifying the provision of inadequate care to pretrial detainees in the Jail, including Cantrell. *Id.* ¶¶ 195, 196. The County knew that NaphCare did not maintain adequate staff and

---

[4] Plaintiff's response does not address the County's argument that the Amended Complaint commingles negligence claims in its count under Section 1983. The Amended Complaint only states a single count against the County (Count III) for deliberate indifference under 42 U.S.C. § 1983. Doc. 43 at 41–49. Accordingly, the Court need not address whether Plaintiff's Amended Complaint states a claim for negligence or under any other theory against the County. No other claims are alleged against the County. *See* Doc. 43. To the extent Plaintiff intended to assert a claim for failure to hire or train, such claim must be brought in a count separate from the deliberate indifference count.

equipment. *Id.* ¶ 197. The County's customs and policies were driven by convenience, financial motives, and the fact that the County knew it was contractually indemnified by NaphCare. *Id.* ¶¶ 199–201. The County had knowledge of the serious medical needs of Cantrell and that the Jail infirmary was overcrowded and lacked necessary staff and equipment. *Id.*  ¶ 206. As a result of the County's customs and policies and the County's deliberate indifference, Cantrell died in an overcrowded infirmary cell. *Id.* ¶¶ 207, 208.  In a light favorable to Plaintiff, she has adequately alleged a *Monell* claim against the County.

### 3.    NaphCare

Plaintiff asserts a § 1983 claim against NaphCare for failure to treat. Although NaphCare is a private entity, it is considered a municipality for purposes of section 1983 liability because the County contracted with NaphCare to provide medical care within the Manatee County jail system. "When a private entity like [NaphCare] contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state." *Buckner*, 116 F.3d at 452. As such, NaphCare was performing a traditional public function and is subject to liability under Section 1983. *See Fields*, 490 F. App'x at 181–82 (noting that "[a]lthough Prison Health is not a governmental entity, '[w]here a function which is traditionally the exclusive prerogative of the state (or here, county) is performed by a private entity,' that private entity, like a municipality, may be held liable under § 1983") (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985)).

NaphCare files its motion to dismiss collectively with Nurse Zeitz, Medical Assistant Kent-Stevens, Nurse Lopez, and Dr. Perez ("NaphCare Defendants"). Doc. 50. The NaphCare Defendants argue that Plaintiff's allegations do not rise to the level of being deliberately indifferent and that Plaintiff has not alleged NaphCare had a policy or custom that was a moving force behind the alleged constitutional violation.

The Eleventh Circuit has held that "deliberate indifference" includes "the delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem," where "the delay does seriously exacerbate the medical problem," and where "the delay is medically unjustified." *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1235 (11th Cir.2010) (quoting *Taylor v. Adams*, 221 F.3d 1254, 1259–60 (11th Cir. 2000)). A delay of even hours has been found to be deliberately indifferent given the "reason for the delay and the nature of the medical need." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir.1999). As discussed in the section below regarding the individual NaphCare Defendants, Plaintiff alleges the medical personnel delayed ordering diagnostic evaluations, the nurses indicated Cantrell was "medically fine" when he wasn't, and they failed to call a physician and obtain the appropriate ambulatory transport or emergency medical services for Cantrell when it was warranted.

NaphCare correctly argues that constitutional liability exists against it only if it had an unconstitutional policy or custom that caused the alleged deprivation of constitutional rights. The Amended Complaint sufficiently alleges the existence of such policy or custom. Plaintiff alleges that NaphCare had a longstanding policy and

practice of delaying or failing to transport pretrial detainees in need of medical assistance to outside urgent cares, emergency rooms, and hospitals when such treatment was necessary. Doc. 43 ¶ 114. NaphCare had a longstanding practice of delaying or failing to activate EMS, 911, Fire Rescue, and/or ambulance services for the benefit of pretrial detainees. *Id.* ¶ 115. NaphCare had a financial incentive to delay or fail to provide pretrial detainees with ambulatory, emergency, specialty, and/or off-site care. *Id.* ¶ 120. NaphCare knew of Cantrell's serious medical needs, which the staff documented, but failed to treat Cantrell or send him to a hospital emergency room. *Id.* ¶ 122. As a result of NaphCare's deliberate indifference to Cantrell's serious medical needs, Plaintiff alleges Cantrell died in an overcrowded infirmary cell. *Id.* ¶ 125.

Plaintiff satisfies the pleading standards for her Section 1983 claim against NaphCare.   The allegations of the Amended Complaint sufficiently allege that NaphCare has a policy or custom of deliberate indifference towards inmates' medical care, which resulted in violation of Cantrell's constitutional rights regarding medical treatment. Plaintiff provided sufficient factual allegations to withstand a motion to dismiss.   Accordingly, NaphCare's Motion to Dismiss the Section 1983 claim is due to be denied.

**B. Nurses Zeitz, Lopez and Thompson, and Medical Assistant Kent-Stevens**

Plaintiff sues NaphCare employees Nurse Zeitz, Nurse Lopez, Nurse Thompson,[5] and Medical Assistant Kent-Stevens contending they were individually deliberately indifferent to Cantrell's medical needs. Deliberate indifference to a pretrial detainee's serious medical needs is a constitutional violation. *Christmas*, 76 F.4th at 1335 (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). To state a claim for deliberate indifference, Plaintiff must allege (1) that Cantrell had a serious medical need; (2) that Defendants exhibited deliberate indifference to that need; and (3) that Defendants' deliberate indifference caused Cantrell's injury. *Christmas*, 76 F.4th at 1335 (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009)). "Deliberate indifferent requires: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Rutledge v. Alabama*, 724 F. App'x 731, 735 (11th Cir. 2018). "[C]onduct that is more than mere negligence includes grossly inadequate care, administering easier but less effective treatment, treatment that is so cursory as to amount to no medical care at all, and, in certain situations, delaying necessary medical treatment." *Id.* "A defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994). A serious medical need may be "one diagnosed by a physician as mandating treatment or one so obvious

---

[5] Nurse Roy Thompson filed his own motion to dismiss (Doc. 74) because at the time the other NaphCare Defendants filed their motion to dismiss, Nurse Thompson had not yet been served.

that even a lay person would 'easily recognize' the need for a doctor's attention." *Race v. Bradford Cty., Fla.*, No. 3:18-cv-153-BJD-PDB, 2019 WL 7482235, at *8 (M.D. Fla. Aug. 20, 2019) (quoting *Mann,* 588 F.3d at 1307). A serious medical need may also "be determined by whether delay in treatment worsened the condition." *Id.* (citing *Mann*, 588 F.3d at 1307). "In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* (quoting *Mann*, 588 F.3d at 1307).

NaphCare Defendants seek dismissal of the claims against Nurse Zeitz, Medical Assistant Kent-Stevens, Nurse Lopez, and Nurse Thompson for failure to state a claim. Docs. 50, 74. These Defendants submit that Plaintiff's allegations, at best, rise to the level of medical negligence and are insufficient to allege a claim of deliberate indifference. The Court disagrees. In the Amended Complaint, Plaintiff alleges facts plausibly suggesting that Nurse Zeitz, Nurse Lopez, Nurse Thompson, and Medical Assistant Kent-Stevens acted with deliberate indifference as to Cantrell's serious medical needs.

As to all four health care practitioners, Plaintiff alleges they knew that Cantrell was in a medical emergency and that he needed certain laboratory and/or diagnostic evaluations to prevent a worsening of his condition but failed to act. Doc. 43 ¶¶ 233–234 (Zeitz); 266–267 (Kent-Stevens); 299–300 (Lopez); 332–333 (Thompson). They knew that Cantrell was in a grave condition and needed to be evaluated, monitored, and followed up by a physician. *Id.* ¶¶ 235, 238 (Zeitz); 268, 271 (Kent-Stevens); 301, 304 (Lopez); 334, 337 (Thompson). They knew that Cantrell needed emergency,

22

ambulance and/or urgent care to an outside facility beyond the Jail. *Id.* ¶¶ 236 (Zeitz); 269 (Kent-Stevens); 302 (Lopez); 335 (Thompson). They knew that Cantrell needed to be monitored and not remain in an overcrowded infirmary cell. *Id.* ¶¶ 237 (Zeitz); 270 (Kent-Stevens); 303 (Lopez); 336 (Thompson).

Despite knowing that NaphCare and the MCSO did not maintain the equipment and adequate staff to render the necessary care to Cantrell who suffered from difficulty breathing, extreme critical vital signs, which was indicative of infection or sepsis, Nurse Zeitz did not call for emergency services or call the facility medical director (*id.* ¶ 239), nor did MA Kent-Stevens (*id.* ¶ 272); Nurse Lopez (*id.* ¶ 305); or Nurse Thompson (*id.* ¶ 338). Plaintiff alleges that these Defendants had actual or constructive knowledge of NaphCare's longstanding and widespread practice of failing to transport pretrial detainees to outside emergent care facilities such as urgent care, emergency rooms, and hospitals. *Id.* ¶¶ 225–228 (Zeitz); 258–261, (Kent-Stevens); 291–294 (Lopez); 324–327 (Thompson). Plaintiff also alleges that these Defendants were indifferent to Cantrell's medical needs in failing to do the following: diagnose, render adequate treatment, refer to a doctor, order a follow-up assessment, run diagnostic testing, activate EMS, activate 911, request ambulatory services, arrange specialty care, or transport to an urgent care, emergency room and/or hospital. *Id.* ¶¶ 240 (Zeitz); 273 (Kent-Stevens); 306 (Lopez); 339 (Thompson). Plaintiff alleges that the deliberate indifference of these Defendants caused Cantrell's death. *Id.* ¶¶ 241, 242 (Zeitz); 274, 275 (Kent-Stevens); 307, 308 (Lopez); 340, 341 (Thompson). Accepting the factual allegations as true, Plaintiff adequately alleges facts that these Defendants

23

were deliberately indifferent to the serious medical needs of Cantrell, and thus she states claims under Section 1983 against Nurse Zeitz, Medical Assistant Kent-Stevens, Nurse Lopez, and Nurse Thompson in Counts IV through VII of Plaintiff's Amended Complaint.

### C.    Dr. Perez

In Count VIII of the Amended Complaint, Plaintiff sues Dr. Perez under Section 1983 for failure to treat Cantrell.  Doc. 43 ¶¶ 345–374.  Plaintiff alleges that Dr. Perez violated Cantrell's Constitutional rights because she acted with deliberate indifference by failing to provide adequate or timely treatment to Cantrell.  *Id.*  Dr. Perez was the medical director for the Jail at the time Cantrell was a pretrial detainee. Doc. 43 ¶ 354. Dr. Perez was a superior to the NaphCare nurses and medical assistants of the Jail, and through this position was subjectively aware of Cantrell's serious medical needs from admission to death. *Id.* ¶¶ 368, 369. Plaintiff alleges that Dr. Perez was deliberately indifferent to Cantrell's needs in failing to diagnose, failing to render adequate treatment, failing to timely render adequate treatment, failing to timely refer to another doctor, failing to timely run diagnostic testing, failing to timely activate 911, failing to timely request ambulatory services, failing to timely arrange specialty care, failing to timely arrange transport to an urgent care, failing to timely arrange transport to an emergency room, and/or failing to timely transport to a hospital. *Id.* ¶ 370. Plaintiff alleges that Dr. Perez's deliberate indifference caused Cantrell's death. *Id.* ¶ 371. Plaintiff adequately alleges a claim of deliberate indifference based on a delay in treatment and/or failure to treat.

### D.    Punitive Damages

Sheriff Wells and the County move to dismiss or strike the Plaintiff's claims for punitive damages against them. Doc. 51 at 12; Doc. 66 at 11. Plaintiff does not object. (Doc. 61 at 3; Doc. 75 at 5). The Court agrees that punitive damages are not recoverable against these Defendants, and the Plaintiff's claim for punitive damages against Sheriff Wells and the County are appropriately stricken. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260 (1981) (punitive damages not allowed against a municipality in Section 1983 action unless expressly authorized by statute). Accordingly, it is

**ORDERED**:

1.     NaphCare Defendants' Motion to Dismiss (Doc. 50) is **denied**.

2.     Sheriff Rick Wells' Motion to Dismiss (Doc. 51) is **granted** to the extent that Plaintiff's claim for punitive damages against Sheriff Wells is stricken. In all other respects, Sheriff Wells' Motion to Dismiss (Doc. 51) is **denied**.

3.     Defendant Manatee County's Motion to Dismiss (Doc. 66) is **granted** to the extent that Plaintiff's claim for punitive damages against Manatee County is stricken. In all other respects, Manatee County's Motion to Dismiss (Doc. 66) is **denied**.

4.      Defendant Roy Thompson's Motion to Dismiss (Doc. 74) is **denied**.

5.     Within **fourteen (14) days** of the date of this Order, Defendants shall answer Plaintiff's Amended Complaint.

**DONE AND ORDERED** in Tampa, Florida on June 27, 2024.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties, if any